UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 67 |
| | ) | Judge Elaine E. Bucklo |
| MYRON ROBINSON, a/k/a "Boojie" | ) | |

**GOVERNMENT'S EVIDENTIARY PROFFER**
**SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits this proffer,

pursuant to Federal Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d

1128 (7th Cir. 1987), of the government's evidence supporting the admission of

coconspirators' statements at trial.

I.    **INTRODUCTION**

This proffer sets forth the evidence relating to the conspiracy charged in the

indictment – that defendant Myron Robinson participated in a conspiracy with others to

violate various federal firearms laws, specifically: (1) willfully transporting into and

receiving in the State of Illinois, where he resided, a firearm purchased or otherwise obtained

by him outside the State of Illinois, in violation of Title 18, United States Code, Section

922(a)(3); (2) knowingly making, in connection with the acquisition of a firearm from a

licensed dealer, false and fictitious oral and written statements intended to and likely to

deceive such dealer with respect to any fact material to the lawfulness of the sale or other

disposition of the firearm, in violation of Title 18, United States Code, Section 922(a)(6); and (3) knowingly delivering and causing to be delivered to any common or contract carrier for transportation or shipment in interstate commerce to persons other than licensed importers, manufacturers, dealers or collectors, a package or other container in which there was any firearm, without written notice to the carrier that such firearm was being transported or shipped, in violation of Title 18, United Stated Code, Section 922(e).[1]

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the scheme." Fed. R. Evid. 801(d)(2)(E). Below are summaries of the case law interpreting this rule, the background of the conspiracy charged in Count One, the evidence of the conspiracy and its participants, and the evidence showing that the proffered coconspirator statements were made during and in furtherance of the conspiracy.

## II.    Governing Law

### A.    General Principles

Federal Rule of Evidence ("Rule") 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The admission of a coconspirator statement against a defendant is proper where the government establishes, by a preponderance of evidence, that: (1) a conspiracy existed; (2) the defendant and the person

_____

[1]Defendant is charged in Count Two of the indictment with a substantive violation of 18 U.S.C. Section 922(a)(3).

making the cited statement were members of that particular conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Godinez, 110 F.3d 448, 454 (7th Cir. 1997); United States v. Santiago, 582 F.2d at 1130-31.

In this Circuit, the preferred way for the government to make its preliminary "coconspirator-statement" factual showings is by the filing of a pretrial written proffer of the government's evidence.[2] See United States v. Rodriguez, 975 F.2d 404, 406 (7th Cir. 1992); United States v. Hooks, 848 F.2d 785, 794-95 (7th Cir. 1988).

In determining whether a coconspirator statement is admissible pursuant to Rule 801(d)(2)(E), the court may examine the coconspirator statement itself to decide whether a conspiracy existed and whether the defendant participated in it. "Bootstrapping" in this fashion is expressly permitted: the statement of a coconspirator may be the predicate for its own admissibility. Bourjaily v. United States, 107 S.Ct. at 2781-82; United States v. Godinez, 110 F.3d at 454-55. See also United States v. Zambrana, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (discussing how overall context of coconspirator statements is what makes the statements very reliable as evidence of a defendant's role in a conspiracy). The evidence used in showing a conspiracy and a given defendant's participation in that conspiracy may

---

[2]    This Court has has substantial discretion in the manner in which it decides to evaluate the admissibility of coconspirator statements. Although the pre-trial proffer is the customary procedure, the Court may admit coconspirator statements subject to the government's eventual proof by preponderance of the evidence of the elements required under Fed. R. Evid. 801(d)(2)(E). See United States v. Doerr, 886 F.2d 944, 967 (7th Cir. 1989).

be either direct or circumstantial.  United States v. Redwine, 715 F.2d 315, 319 (7th Cir.

1983), cert. denied, 467 U.S. 1216 (1984).

Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A),

without reference to the coconspirator statement rule.  See  United States v. Shoffner, 826

F.2d 619, 626-7 and n.10 (7th Cir.), cert. denied sub nom., Stange v. United States, 467 U.S.

958 (1987).  Of course, a defendant's own admissions are obviously and powerfully relevant

to establish the factual predicates for the admission of coconspirator statements against him.

See United States v. Potts, 840 F.2d 368, 371-72 (7th Cir. 1987); United States v. Alexander,

741 F.2d 962, 966 (7th Cir. 1984), overruled on other grounds, United States v. Ginsburg,

773 F.2d 798, 802 (7th Cir. 1985), cert. denied, 475 U.S. 1011 (1986).

Where Rule 801(d)(2)(E) is implicated, it is clear that once the charged conspiracy is

established, "only slight evidence is required to link a defendant to it."  Shoffner, 826 F.2d

at 617 (quoting and citing prior authorities).  It is also clear that "statements made during the

course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible

against those who arrive late to join a going concern."  Potts, 840 F.2d at 372 (citing cases).

"Conversations made by conspirators to prospective coconspirators for membership purposes

are acts in furtherance of the conspiracy."  Shoffner, 826 F.2d at 628 (citations omitted).

Further, certain principles of general conspiracy law are relevant to the Rule

801(d)(2)(E) inquiries to be made as to the existence of a conspiracy and a defendant's

membership in it.  For instance, a defendant joins a conspiracy if he agrees with a conspirator

to participate in the project or enterprise that is the object of a scheme involving others and

4

knowingly acts in furtherance of that object; it is immaterial whether the defendant knows, has met with, or has agreed with every coconspirator.  United States v. Boucher, 796 F.2d 972, 975 (7th Cir. 1986); United States v. Balistrieri, 779 F.2d 1191, 1225 (7th Cir. 1985), cert. denied sub nom., United States v. DiSalvo, 475 U.S. 1095 (1986).  Similarly, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy.  United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); United States v. Towers, 775 F.2d 184, 189 (7th Cir. 1985).  A defendant may be found guilty even if he joined or terminated his relationship with core conspirators at different times.[3]  United States v. Ramirez, 796 F.2d 212, 215 (7th Cir. 1986): United States v. Noble, 754 F.2d 1324, 1329 (7th Cir.), cert. denied, 474 U.S. 818 (1985). Even after a conspirator has concluded his active participation in the activities of the conspiracy, the statements of coconspirators will be admitted against him, unless he affirmatively establishes that he has withdrawn from the scheme.  United States v. Feldman, 825 F.2d 124, 129 (7th Cir. 1987).  To withdraw from a conspiracy, a conspirator must take steps to disavow or defeat the purpose of the conspiracy, either by communicating the fact of his withdrawal to his coconspirators or by informing the authorities of the conspiracy.

---

[3]    A defendant, even if not an "agreeing" member of the conspiracy, may also be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy. United States v. Kasvin, 757 F.2d 887, 889-891 (7th Cir.), cert. denied, 474 U.S. 1032 (1985); United States v. Galiffa, 734 F.2d 306, 309-11 (7th Cir. 1984).  There is no requirement that the indictment charge the defendant with aiding and abetting the conspiracy.  Kasvin, 757 F.2d at 890.

United States v. Wilson, 134 F.3d 855, 863 (7th Cir. 1998); United States v. Andrus, 775 F.2d 825, 850 (7th Cir. 1985).

**B.        The "In Furtherance" Requirement**

To establish that a statement was made "in furtherance" of the conspiracy, the government need only show "some reasonable basis" upon which to conclude that the statement furthered the conspiracy. United States v. Zizzo, 120 F.3d 1338, 1352 (7th Cir.), cert. denied, 118 S.Ct. 566 (1997); United States v. Stephens, 46 F.3d 587, 597 (7th Cir. 1995); Shofner, 826 F.2d at 628. Furthermore, the government has a "relatively low burden of proof on this issue." Shofner, 826 F.2d at 628 (collecting cases). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception. United States v. Singleton, 125 F.3d 1097, 1107 (7th Cir. 1997); United States v. Powers, 75 F.3d 335, 340 (7th Cir. 1996); United States v. Stephenson, 53 F.3d 836, 845 (7th Cir. 1995). Thus, updates on a conspiracy's progress, Potts, 840 F.2d at 371, and conversations concerning planning or review of coconspirators' exploits, United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985), cert. denied, 475 U.S. 1081 (1986), are statements in "furtherance."

As discussed below, the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement.

1.    **Statements Made to Execute the Conspiracy**

Statements made by conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. United States v. Cox, 923 F.2d 519, 527 (7th Cir. 1991). In the instant case, for example, statements made by the conspirators to arrange for the acquisition and shipment of firearms from Louisiana to Illinois, were plainly made "in furtherance" of the conspiracy charged in Count One of the indictment.

Statements such as these, which are "intended to promote the conspiratorial objectives," are readily admitted pursuant to Rule 801(D)(2)(E). See, e.g., United States v. Sinclair, 109 F.3d 1527, 1534 (10th Cir. 1997); United States v. Shores, 33 F.3d 438, 444 (4th Cir. 1994); United States v. DeLuna, 763 F.2d 897, 909 (8th Cir. 1985); United States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983), cert. denied, 465 U.S. 1069 (1984); United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982), cert. denied, 459 U.S. 1117 (1983). Statements which prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. United States v. Monus, 128 F. 2d 376, 392 (6th Cir. 1997); United States v. Simmons, 923 F.2d 934, 945 (2d Cir.), cert. denied, 111 S.Ct. 2018 (1991). See also United States v. Smith, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's

assistance is determined by an examination of the context in which it is made.  Garlington

v. O'Leary, 879 F.2d 277, 284 (7th Cir. 1989).

### 2.  **Statements Regarding the Conspiracy's Activities.**

Statements "describing the purpose, method, or criminality of the conspiracy," are

made in furtherance of the conspiracy because conspirators make such statements to guide

each other toward achievement of the objectives of the conspiracy. United States v. Ashman,

979 F.2d 469, 489 (7th Cir. 1992).  Similarly, statements that are part of the information flow

between conspirators made in order to help each conspirator perform his role are "in

furtherance" of the conspiracy, United States v. Godinez, 110 F.3d at 454; United States v.

Herrero, 893 F.2d 1512, 1527-28 (7th Cir.), cert. denied, 496 U.S. (1990); Garlington v.

O'Leary, 879 F.2d at 283-84;  United States v. Van Daal Wyk, 840 F.2d 494, 499 (7th Cir.

1988).   Statements to assure that a coconspirator can be trusted to perform his role also

satisfy the "in furtherance" requirement.  United States v. Buishas, 791 F.2d 1310, 1315 (7th

Cir. 1986); United States v. Romo, 914 F.2d 889, 897 (7th Cir. 1990), cert. denied, 111 S.Ct.

1078 (1991); United States v. Martinez de Ortiz, 907 F.2d 629, 635-36 (7th Cir. 1990), cert.

denied, 111 S.Ct. 684 (1991).

### 3.  **Statements to Recruit Conspirators**

Statements made to recruit potential members of the conspiracy are made "in

furtherance" of the conspiracy.  United States v. Godinez, 110 F.3d at 454;  Shoffner, 826

F.2d at 628. "Conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." United States v. Dorn, 561 F.2d 1252, 1256-57 (7th Cir. 1977). See also Herrero, 893 F.2d at 1528; United States v. Doerr, 886 F.2d at 951; Garlington, 879 F.2d at 283.

### 4.    Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener

Statements made by conspirators to other individuals who participate in or interact with the conspiracy contribute to the conspiracy. United States v. Van Daal Wyk, 840 F.2d 494 (7th Cir. 1988). The Seventh Circuit has also found that "[s]tatements made to keep co-conspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." United States v. Stephenson, 53 F.3d 836, 845 (7th Cir. 1995); United States v. Curtis, 37 F.3d 301, 307 (7th Cir. 1994).

As the Seventh Circuit held in United States v. Pallais, 921 F.2d 684, 688 (7th Cir. 1990):

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a co-conspirator by an informative nickname . . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are part of the information flow between conspirators intended to help each perform his role, and no more is required to make them admissible.

(Internal quotation marks omitted.) The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. See id.;

Van Daal Wyk, 840 F.2d at 499 ("statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A co-conspirator's statement describing a defendant's past deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. United States v. Sophie, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. Garlington, 879 F.2d at 284.

### 5.    Statements Relating to the Progress and Past Accomplishments of the Conspiracy

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. Potts, 840 F.2d at 371; Molt, 772 F.2d at 368-69. Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. United States v. Doyle, 771 F.2d 250, 256 (7th Cir. 1985).

### 6.    Statements to Conceal the Criminal Objectives of the Conspiracy

Statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where ongoing concealment is one of its purposes. United

States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987). "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." United States v. Troop, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. See Van Daal Wyk, 840 F.2d at 499. The use of violence and threats to intimidate the members of a conspiracy and to protect its secrecy are also relevant to and in furtherance of the ongoing conspiracy. United States v. Markowski, 772 F.2d 358, 366 (7th Cir. 1985).

### C.    Admission of Statements Without Regard to the Coconspirator Rule

As discussed above, statements that a defendant personally makes are admissible against him as admissions of a party-opponent pursuant to Rule 801(d)(2)(A) without reference to the coconspirator statement rule. See Shoffner, 826 F.2d at 626-627 and n.10. In addition, a statement that the party has "manifested an adoption or belief in its truth" is admissible under Rule 801(d)(2)(B).    Since Myron Robinson, along with Carlos Orr, Teresa Woodard, Mary Huglon Williams, Reginald Dean and others are all members of the conspiracy, statements made by one of them in furtherance of the conspiracy are admissible as to Robinson.

Statements that a conspirator does not make personally, but which he impliedly or expressly authorizes an agent to make in the context of an existing agency relationship are admissible pursuant to Rule 801(d)(2)(D). United States v. Feldman, 825 F.2d 124, 128 (7th Cir. 1987). See also United States v. Gibson, 690 F.2d 697, 701 (9th Cir. 1982); United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978); United State v. AMREP Corp., 560

11

F.2d 539, 545 (2d Cir. 1977), <u>cert. denied</u>, 434 U.S. 1015 (1978).  An agent-principal relationship exists when the agent acts on behalf of the principal and subject to his or her control and if the agent consents to so act.  <u>United States v. Feldman</u>, 825 F.2d at 129, <u>quoting</u> <u>Southern Pac. Transp. Co. v. Continental Shippers Ass'n</u>, 642 F.2d 236, 238 (8th Cir. 1981).  A statement made by a "person authorized by the party to make a statement concerning the subject" is admissible under 801(d)(2)(C).

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an example would be a declaration that is simply an order or a suggestion.  <u>See</u> <u>United States v. Tuchow</u>, 768 F.2d 855, 868, n.18 (7th Cir. 1985).  The coconspirator statement rule is not implicated if a statement is not offered in evidence to prove the truth of the matter asserted and thus does not constitute "hearsay" as defined by Rule 801(c).  <u>United States v. Feldman</u>, 825 F.2d at 127.  Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the <u>Bourjaily</u> factual predicates, but with corresponding limiting instructions, where such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy.  <u>United States v. Herrera-Medina</u>, 853 F.2d 564, 565-566 (7th Cir. 1988); <u>Van Daal Wyk</u>, 840 F.2d at 497-498; <u>Tuchow</u>, 768 F.2d at 867-869; <u>United States v. Magnus</u>, 743 F.2d 517, 521-523 (7th Cir. 1984).

**D.**        **<u>The Absence of Confrontation Issues with Coconspirator Statements</u>**

No separate Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements which are offered for their truth against the defendant. This is because the requirements for admission under Rule 801(d)(2)(E) are identical to "the requirements of the Confrontation Clause." Bourjaily, 483 U.S. at 182. Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met. Id.; United States v. Singleton, 125 F.3d at 1107-08. See also Idaho v. Wright, 497 U.S. 805, 814 (1990) (Confrontation Clause is not violated where hearsay statement falls within a firmly rooted hearsay exception).   As a result, in considering the admissibility of proffered coconspirator statements, the trial court does not consider whether or not the coconspirator-declarant is "unavailable" or whether there is independent evidence to establish the "reliability" of the proffered statements.  Inadi, 475 U.S. at 400; Bourjaily, 483 U.S. at 183-84.

III.    **THE GOVERNMENT'S PROFFER OF THE EVIDENCE IT WILL PRESENT REGARDING THE EXISTENCE OF THE CHARGED CONSPIRACY**

At trial, the government's evidence will establish that defendant conspired and agreed with other individuals to violate federal firearms laws by fraudulently obtaining firearms through the use of "straw purchasers" outside of Illinois and having others then transport those firearms to Illinois for him by means that included sending the firearms through common carrier without proper notice.  Below, the government sets forth a summary of the evidence it will present regarding the existence of the charged conspiracy, addressing the

following three areas: (1) an overview of the conspiratorial evidence; (2) a proffer of some of the cooperator testimony; and (3) a summary of the documents and physical evidence corroborating the cooperator testimony. Such evidence establishes the threshold requirement for admitting coconspirator statements during the trial of this case. Again, the evidence proffered herein consists of summaries. It does not include all coconspirator statements the government intends to introduce at trial or all documents and physical evidence gathered during the course of this investigation.

### A.    An Overview of the Conspiratorial Evidence

Most conspiracies are clandestine operations that have no formal agreement or structure. Indeed, the Seventh Circuit has noted that "[d]ue to the covert nature of a conspiracy, direct evidence is rare." *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995).

Myron Robinson conspired with others to fraudulently obtain firearms outside Illinois and send them to him in Illinois. As part of this conspiracy, Robinson and Carlos Orr arranged to have certain individuals who lived in Louisiana and other states go to federally-licensed gun dealers in, among other places, Louisiana to buy guns for Robinson. Because federal law prohibits convicted felons from possessing weapons that had traveled in interstate commerce, and because Robinson and Orr were convicted felons, they recruited people who had no felony convictions to "straw purchase" these firearms for them. Robinson and/or Orr would instruct the straw purchasers what types of guns to buy for them, and would provide them with the funds to make the purchases. Robinson and/or Orr would then instruct them

where and how to ship some of the guns they purchased. Pursuant to their directions, certain of the firearms purchased in this manner were shipped through Federal Express from Louisiana to Robinson in Maywood, Illinois.

The government will present documents, including records from Federal Express, Western Union, and firearms dealers; some of the firearms themselves that were purchased in this manner and which eventually were recovered; as well as the testimony of numerous witnesses to prove the existence of the conspiracy.

**B.       A Proffer of Some of the Cooperator Testimony**

The statements summarized below are based principally on the grand jury testimony of these coconspirators and/or reports of their statements to agents and officers. This *Santiago* proffer is necessarily just a summary of the more detailed statements of some of the potential witnesses provided to the defense.

**1.       Carlos Orr**

Carlos Orr is expected to testify that he met Myron Robinson in about 2001. Some time after 2001, Orr was with Robinson and a man named Roynal Coleman (who had introduced Orr and Robinson) at Robinson's residence, when Coleman told Robinson that he, Coleman, needed some "heaters," which Orr understood to mean guns. Robinson told Coleman that Robinson had a "hook up" down south, which Orr understood to mean a source for guns. Coleman told Orr to follow up with Robinson.

A short time later, Orr and Robinson spoke at Robinson's residence in Maywood about getting guns from down south. In Orr's presence, Robinson called a woman named

"Teresa," and Robinson told Teresa that his (Robinson's) man was coming down to get some of those things, and to arrange for some girls for them to party with. Robinson handed the phone to Orr, and Teresa told Orr that she would take care of him, and that they can do it through the mail, which he understood to mean sending guns through the mail.

Orr, Robinson and a man known as "Losie" drove to Shreveport, Louisiana. Once there, they met Teresa. In a conversation between Robinson, Orr, Teresa and Losie, Robinson told Teresa that he needed guns to take back to Chicago. Teresa told them that it would only take about 15 minutes to get a gun at the pawnshop, and that if you did not have a felony conviction then you could get up to five guns in 15 minutes. She also told Orr that they, which Orr understood to mean she and Robinson, had done this before. She recruited people to purchase the guns for them, offering to pay them $100 to make the purchase.

Robinson, Losie, Orr, Woodard and the purchasers drove to two or three different pawnshops, one of which was called "Cash In A Flash." A couple of times, Robinson, Orr and Losie went into a pawnshop to determine what kinds of guns were available and at what cost. They were interested in buying Hi-Point guns because they were inexpensive. After looking at the guns, they would exit the store and tell Teresa what they wanted; Teresa and a buyer then would go inside the pawnshop and make the purchase. After making the purchase, they would put the guns in the trunk of the car. During that trip, they purchased about ten guns in one day, with Robinson paying each of the straw purchasers with money Orr gave to him, which Orr, in turn, had received from Coleman.

16

Robinson and Teresa boxed up the guns they had purchased. They put the individual boxes with each of the guns inside one larger box and covered the smaller individual boxes with clothes. Robinson, Orr, Teresa and Losie drove to a FedEx store. Robinson and Teresa entered the FedEx store with the box, and exited the store without the box. Robinson told Orr he would give Teresa something, and Orr saw Robinson give her an unknown sum of money.

Robinson, Orr and Losie then drove to Monticello, Mississippi. While in Monticello, Robinson called his brother and asked if the box was there. Robinson then asked his brother to open the box and tell him if he saw them. Robinson told Orr that his brother said they were in it.

After returning to Maywood, Illinois, Robinson and Orr went to Robinson's house and took the box into the basement. They opened the box , and removed the clothes and the guns. Robinson kept one or two guns for himself, Orr kept one for himself (although he later gave it to Robinson who brokered a deal for its sale), and then Orr put the rest of the guns in his car and drove them to Coleman's house and gave them to him. Coleman gave Orr $500 plus the cost of the guns.

Robinson told Orr that they could make money by buying guns cheaply in the south and then selling them in the Chicago area. They decided to go back down south in a couple of weeks to get more guns. Before traveling back down to Shreveport, Orr called Teresa and told her he needed more of "them things" or "girls," or another code word for guns, and he asked her to find people to buy them for them, and she agreed to do it.

17

Robinson and Orr drove separately to Monticello. In Monticello, they bought about eight guns from Robinson's uncle. They then drove to Shreveport, where they met Teresa, a man known as "Poon Tang," and a couple of individuals who had agreed to purchase guns for them. Orr drove with Robinson and Losie to at least two guns shops, while Teresa and the buyers drove in another car. Orr told the buyers to purchase 9 millimeter and .45 caliber Hi-Points, and the buyers went into the gun shops with Teresa. The buyers brought the guns back to Orr's rental car.

They took the guns back to a hotel, where Robinson and Teresa placed them into one box. Robinson placed the box into Teresa's car and they left. They returned a short time later and Robinson gave a FedEx receipt to Orr. The FedEx receipt indicated that the box had been sent to the street on which Robinson lived. After driving back to Monticello, Robinson packed the guns and placed them in the car in which he rode.

After returning to Maywood, they took the guns to the basement of Robinson's house. They took some of the guns to another location and gave them to an unknown individual. Robinson and Orr each kept some of the guns. Orr sold some of the guns to Coleman, and gave three of the guns to two brothers who sold them and gave Orr some of the proceeds of the sales. Robinson told Orr that he was going to sell a few guns to a member of a gang.

A short time later, Orr called Teresa and told her he was going to Louisiana again. Orr planned to drive to Monticello and then to Shreveport, where he would get guns and then drive the guns back to Monticello, where he would meet Robinson. After arriving in Shreveport, "Poon Tang" introduced him to some individuals who straw purchased about 10

18

guns for him.  After acquiring the guns, Orr met Teresa and one of her friends at her friend's house.  They boxed up the guns and drove separately towards the FedEx store.  Orr waited at a gas station rather than going to the FedEx store.  Teresa told Orr that he should leave and that she would take care of shipping the boxes to his girlfriend's house.  Orr drove back to Monticello and met with Robinson, telling Robinson about the guns he had acquired and the fact that they had been sent to Orr's girlfriend's house.  Orr learned from speaking to his girlfriend that no box had arrived.  Teresa told Orr that the feds had gotten the box, and she gave Orr a telephone number to call and claim it.  Orr learned a couple days later that a box containing rocks had arrived to his girlfriend's residence.

On one of his trips to Shreveport, Teresa introduced Orr to a woman named Mary who Orr thinks bought two guns for him on a later occasion.  Orr drove Mary to the gun shop to buy the guns.

Orr made further trips to Monticello and Shreveport to buy guns by himself, but Robinson still arranged for people to buy guns for him on those trips.  Orr gave to Robinson some of the guns he purchased on those additional trips, and Robinson later would give Orr money.  Orr sold some of the guns himself.

### 2.    Teresa Woodard

Teresa Woodard is expected to testify that she has known Myron Robinson since about 1998.  In about March 2003, Robinson called her and told her that he was coming to town, and that he needed her to do something for him.  The next morning she met him at a motel in Bossier, Louisiana.  Robinson told her that he was at war with some guys who were

trying to kill him, and he asked her to buy guns for him. He asked her to go with Orr, to whom she was just introduced, to buy guns. Orr asked Robinson what pawnshop they had been to the previous day, and Robinson said it was on Hollywood. Woodard told them it was called National Pawnshop (but it was actually National Jewelry and Loan pawnshop). In that motel room, Woodard saw Robinson and others packing guns in boxes and taking the serial number labels off the boxes. They were putting boxes with individual guns into one larger box.

Woodard and Orr drove to National Jewelry and Loan pawnshop. Once there, Orr instructed Woodard to purchase two 9 millimeter Hi-Points, and he gave her about $400 to buy them. Orr did not accompany her into the store to buy them. Woodard purchased the two Hi-Points and returned to the car, where she gave the guns to Orr. Orr allowed her to keep the approximately $162 in change from the purchases.

Woodard drove Orr back to a hotel room, where she saw Robinson and others. Orr gave the bag with the two boxes to Robinson, who took the boxes out of the bag and pealed the serial number stickers from the boxes. Robinson removed the guns from the boxes and wrapped them in towels. Robinson and Orr argued about separating the two guns Woodard had purchased from the rest of the guns. Robinson wanted them separated, but Orr did not. Woodard asked Robinson if she would get into trouble if they were caught, and Robinson told her that she would not get into trouble because he would file off the serial numbers. They wrapped the two guns Woodard had purchased into towels and placed them in a smaller box.

20

Some time later, but before April 3, 2003, Robinson called Woodard and told her that Orr was coming to Shreveport to get more business and that Robinson needed her to help him. Orr then got on the phone and told Woodard that he was going down there for more business and that Woodard should go to Western Union to pick up a package that would contain money. That night, Woodard picked up from Western Union a package containing about $1,000. Woodard called Robinson and told him that she had gotten the money. A couple days later, Woodard met Orr at a casino in Shreveport. There, Woodard introduced Orr to Mary Huglon Williams, and Orr told Woodard that he was interested in having Williams buy some guns for him.

The next day, Orr asked Woodard to take Williams to buy some guns. When Woodard picked up Williams, she was with Orr in a car that Williams had rented. Woodard and Williams went to National Jewelry and Loan. Williams went into the store and emerged with a brown paper bag. Woodard drove her to a barbershop where they met Orr and others. Orr asked Williams if she had done it, and she said she had done it. Williams then left with Orr.

The next day, Orr called Woodard and told her to meet him at Williams' house because he needed to ship the packages to Chicago. When Woodard arrived at Williams' home, Williams and Orr were in the driveway. Orr put into a FedEx box two boxes that looked like the kinds of boxes that contained guns. There already was another FedEx box there. Orr gave Woodard and Williams a piece of paper with an address and name of someone whom Orr said was his brother and who was a reverend. Woodard and Williams

21

drove to a FedEx store and, Woodard believes, they each filled out one shipping label.  They used alias names and shipped them to a town in Illinois.

Some time prior to April 3, 2003, Orr told Woodard that he wanted to buy 50 guns, and he asked her to take a man named "Allan" to a pawn shop.  Woodard took Allan to a pawnshop.  While Allan was in the pawnshop, Robinson called Woodard and then met her outside the pawnshop.  Robinson gave Woodard $200 or $250 and instructed her to ship them to a different address, which he gave to her, because, he said, Orr had turned on him.  Allan returned to the car with a bag that he said contained five guns.  Woodard drove Allan to meet Orr.  Allan gave Orr the bag and Orr paid Allan.  Orr placed the bag into a box and put the box into the trunk of Woodard's car.  Orr gave Woodard money to ship the box through FedEx.  However, Woodard shipped the box to the address that Robinson previously had given to her.  She indicated on the FedEx forms that the shipper was Nayantha Calhoun.

On about April 2, 2003, Robinson called Woodard and told her that Orr had set him up and that Robinson had been shot three times and needed a gun for protection.  Robinson asked Woodard to buy him two guns, and he wired her $700 through Western Union.  On April 3, 2003, Woodard went to National Jewelry and Loan and purchased one gun for Robinson.  She shipped the gun to him through FedEx using the last name "Calhoun," and she made up a false address for the shipper's address.  A couple of weeks later, Robinson called Woodard and told her to wire him the remainder of the money, so she sent him $280 through Western Union.

Woodard recalls meeting someone called "Reggie," whom she saw handing a bag to Orr. She heard Reggie tell Orr that he had spoken to Robinson and that Orr was supposed to pay Reggie more money than Orr was giving him. Reggie told Orr that he would not have helped Orr had it not been for Robinson, which Woodard understood to refer to buying guns.

### 3.    Mary Huglon Williams

Mary Huglon Williams is expected to testify that she met Carlos Orr in Shreveport in about 2003. Teresa Woodard already knew Orr and introduced him to her as her god brother. About one month after their initial meeting, Woodard told Williams that Orr was in town again and wanted to see her. When they saw each other, Orr told Williams that many people did not like him, so he needed protection. The next day, she met Orr and Woodard at a barbershop. Williams drove to a pawnshop in one car, while Woodard and Orr drove in another car. Orr told Williams that both he and she needed a gun for protection. Orr told Williams that he did not have identification, and he asked her if she would get the gun for him. Williams filled out the paperwork for the gun, indicating that the gun was for her, even though it was for Orr. Woodard was present during this transaction.

The next day, Orr asked Williams if she would buy another gun for him, and she agreed to do so. Later that day, Woodard picked her up and they drove to Orr's hotel, where they picked him up. They drove to a pawnshop, and all three of them entered the shop. Woodard filled out the paperwork for the gun and gave the clerk money that Orr had given to her. She then gave the gun to Orr while they were still in the shop. They dropped off Orr back at his hotel, and he took the gun with him.

The next day, Williams went with Woodard to a FedEx store.  Woodard showed to Williams a piece of paper with at least one address on it.  Inside the FedEx store, Woodard gave to Williams a piece of paper with an address of a location that she believes was a beauty shop near Chicago, and she told Williams to copy the information onto the FedEx slip. Williams filled out the slip for one box and Woodard filled out the other.  Williams wrote on the FedEx slip information Woodard gave to her as to the sender's name, and she believes the sender's address, as well as the recipient's name and address.

### 4.   Reginald Dean

Reginald Dean met Myron Robinson in about 1994 or 1995, when they worked together.  They were friends for a few years, but then lost touch until about 2003.  In early 2003, Robinson and his brother came to Dean's residence and Robinson asked Dean to buy two guns for him, telling Dean that he was having trouble with some guys in Mississippi and needed guns for protection.  Robinson promised Dean that he would pay him for doing it, but ultimately he did not.  About 3 or 4 hours later, Robinson and his brother returned and took Dean to National Jewelry and Loan pawnshop.

Before going into the pawnshop, Robinson told Dean that he wanted him to buy three .380 caliber firearms, and he gave Dean money with which to buy the firearms.  Dean, Robinson, and Robinson's brother entered the pawnshop.  Dean purchased three .380 caliber Hi-Points while Robinson and his brother looked at jewelry.  Once they returned to the car, Dean gave the guns to Robinson.  Later that week, Robinson's brother told Dean that Robinson had taken the guns back to Chicago with him.

About a little less than two weeks later, Robinson called Dean and then came to Dean's residence with people named Carlos (Orr), Teresa (Woodard), and Jerrell. Dean heard Robinson and Carlos talk about buying guns. In Robinson's presence, Carlos asked Dean to buy guns for him that he would take back to Chicago, and he told Dean that he would pay him for doing it. Robinson told Dean that he and Carlos were both putting money into this. At one point, Robinson and Carlos argued about money in connection with the guns, and Robinson stated that he, Robinson, was running this, so things would be run his way. Dean initially said that he would not make any more gun purchases for him. Then about one hour later, Robinson returned to Dean's residence and asked Dean to purchase guns for him, telling Dean that he would pay Dean for the three guns he previously had purchased as well as the guns he was then requesting that Dean buy. Dean agreed to do it.

The next day, Robinson called Dean and told him that Carlos and Teresa would pick him up and take him to the pawnshop to buy guns. Robinson told Dean that he would take care of the money before he leaves. Carlos and Teresa picked up Dean that day and took him to Cash In a Flash pawnshop. Carlos told Dean what kinds of guns he wanted Dean to buy, and inside the pawnshop Carlos pointed out the guns he wanted, giving Dean money to buy the guns. Dean gave the guns to Carlos once they returned to the car, and they dropped Dean off at his residence.

Dean recalls that at some point, Robinson told him that he would remove the serial numbers from the guns with acid.

### C.    A Summary of Key Documents and Physical Evidence Corroborating the Existence of the Conspiracy

Below are some of the documents and physical evidence the government intends to introduce at trial that corroborate the cooperators' expected testimony and support the existence of the conspiracy.

The government intends to introduce ATF Form 4473's from various purchases of firearms made by cooperating straw purchasers. These Form 4473's, which purchasers of firearms are required to complete and provide to licensed firearms dealers when they purchase firearms, will show which firearms the straw purchasers were buying (including manufacturer, model and serial number), as well as when they made the purchases and from what dealers they were purchased. In each of those forms, the straw purchasers indicated that they were the actual purchasers of the firearms and were not purchasing them for anyone else. The evidence will show that those representations were false.

The government will introduce records from Federal Express showing that packages were sent from Shreveport, Louisiana to Robinson's address in Maywood, Illinois, on March 7, 2003, and on April 3, 2003. These records show that the first package was signed for by "M. Robinson," and the second package, although addressed to M. Robinson, was signed for by "S. Smile." ATF Form 4473's show that on March 7, 2003, the date the first package was sent to Robinson's address, Teresa Woodard purchased two guns from National Jewelry and Loan, and that the previous day, Reginald Dean had purchased three firearms from the same store. An ATF Form 4473 shows that on April 3, 2003, the same day that the other Federal

Express package was sent from "M. Calhoun" in Shreveport to Myron Robinson's address, Teresa Woodard purchased a gun at National Jewelry and Loan.

The government will introduce records from Western Union showing that on March 14, 2003, Carlos Orr sent $920 to Teresa Woodard; that on April 3, 2003, Myron Robinson sent $700 to Teresa Woodard; and that on April 15, 2003, Teresa Woodard sent $280 to Myron Robinson.

The government will present evidence that some of the firearms straw purchased by Woodard and Dean were in fact recovered in Chicago.  That evidence will include some of the guns themselves and, if necessary, testimony from the police officers who recovered them.  With respect to at least three of those guns, they had obliterated serial numbers that were restored by forensic scientists with the Illinois State Police.

On August 20, 2003, Myron Robinson was interviewed by law enforcement officers, and in addition to admitting that several people bought guns for him and his friends, he admitted that he lived at the same address to which the Federal Express packages of March 7 and April 3, 2003, were sent.

IV.    **CONCLUSION**

The above is a summary outline of the evidence that the government will introduce to establish that the charged conspiracy existed.  This Court should find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


S/ Matthew M. Getter

By:    _____
MATTHEW M. GETTER
STEPHEN CHAHN LEE
Assistant United States Attorneys
219 South Dearborn Street, 5th Fl.
Chicago, Illinois 60604
(312) 886-7651/353-4127

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the

## GOVERNMENT'S EVIDENTIARY PROFFER
## <u>SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS</u>

was served on August 22, 2008, in accordance with Fed. R. Crim.P.49, Fed R. Civ.P.5,LR5.5, and the General Order on Electronic Case filing (ECF), pursuant to the district court's system as to ECF filers.

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney

By:     _s/ Matthew M. Getter_____
MATTHEW M. GETTER
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-7651