IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MYRON ROBINSON, )<br>)<br>Defendant. ) | No. 08 CR 67<br><br>Honorable Elaine Bucklo,<br>Judge Presiding. |

**DEFENDANT'S MOTIONS IN LIMINE
PURSUANT TO FED. R. OF EVID. 404 (b) AND 403 TO
BAR THE ADMISSION OF DRUG AND GANG EVIDENCE**

Now comes the Defendant, MYRON ROBINSON, by his attorney, Donna Hickstein-Foley, and moves this Honorable Court to prohibit or otherwise limit the Government's proposed submittal of drug and gang involvement by Defendant. None of the proposed evidence discussed below is an element of the offense or admissible under the exceptions of other crimes evidence of Fed. R. 404 (b). To the extent the Court may find that such other crimes evidence fits a 404 (b) exception, the Defendant requests the evidence be barred as so prejudicial as to outweigh any probative value. Fed. R. 403. In support, it is stated:

1.  **Government Intends To Introduce Evidence of Defendant's Drug Dealing**

    The Defendant moves this Court to preclude the Government from attempting to introduce evidence or make argument of Defendant's drug dealing. Specifically, the Government has notified Defendant it intends to introduce evidence through its witnesses Carlos Orr and Theresa Woodard that Defendant dealt drugs.

a.      **Carlos Orr**

Carlos Orr testified before the Grand Jury that an individual named Roynal Coleman

. . . had me drop off drugs to Robinson and pick up money from Robinson for him. I also was sort of a middleman when it came to drug dealing. In other words, I would arrange for my customers to buy drugs – usually either powder or crack cocaine and occasionally marijuana – from Coleman, and I would keep a cut of the proceeds from the sale of the drugs. I was also a Conservative Vice Lord, as was Coleman, although I did not hold rank in the gang. Coleman was a five star universal, and Robinson was a three star universal. I acted as a courier of drugs and money between Robinson and Coleman several times during about a several month period.

After a while, Robinson and I became friends. We also maintained our own drug relationship. . . .

(Exhibit A, pp. 312-313)

b.      **Theresa Woodard**

Theresa Woodard advised the Government's agents that she had

. . . met Myron Robinson in 1998 in Shreveport, Louisiana. Woodard stated she knew Robinson to be a member of the Vice Lord Street Gang originally from Chicago, Illinois. Woodard stated she knew Robinson dealt drugs while residing in Chicago and had moved to Shreveport to escape that lifestyle.

(Exhibit B, pp. 351-352)

## II. The Government Intends to Introduce Evidence of Defendant's Gang Involvement

The Defendant moves this Court to preclude the Government from attempting to introduce evidence or make argument of Defendant's gang activity. Specifically, the Government has notified Defendant it intends to introduce evidence through Carlos Orr and Theresa Woodard that Defendant participated in gang activity.

    a.    **Carlos Orr**

During Mr. Orr's grand jury testimony, he stated:

. . . Robinson was a member of the Conservative Vice Lords in Maywood, and I lived in Maywood. . . . . I was also a Conservative Vice Lord, as was Coleman, although I did not hold rank in the gang. Coleman was a five start universal and Robinson was a three star universal.

(Exhibit A, p. 312)

    b.    **Theresa Woodard**

During a proffer by Ms. Woodard, she reportedly told agents Woodard stated she met Myron Robinson in 1998 in Shreveport, Louisiana. Woodard stated she knew Robinson to be a member of the Vice Lord Street Gang originally from Chicago, Illinois. . . . Woodard stated she learned from Orr and Robinson they were sending the firearms back to Maywood and /or Chicago to use in protecting themselves from the Gangster Disciples. Woodard stated they needed to protect themselves from the Gangster Disciples stemming from an incident that occurred at a Chicago area nightclub where many people died. . . . Woodard stated she knew within the Vice Lord

Organization, Orr held higher status than Robinson, but that in Shreveport nobody would deal with Orr until Robinson gave his approval.

(Exhibit B, pp. 351-353)

### III. Argument

Federal Rule 404 (b) states in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . .

"Rule 404 (b) prevents the admission of evidence of other crimes, wrongs, or acts to prove that a person acted in conformity with his prior conduct." *United States v. Harris* (7th Cir. August 6, 2008) 080608, 07-2195 slip opinion. As the Court observed in *United States v. Simpson* (7th Cir. 2007) 479 F.3d 492, 497, Rule 404(b) plainly prohibits the government from introducing evidence of prior bad acts to show that the defendant's character is consistent with a propensity to commit the charged crime. A district court properly admits evidence of prior acts under Rule 404(b) if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue: (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is

4

not substantially outweighed by the danger of unfair prejudice. *United States v. Moore*, (7th Cir. July 1, 2008) No. 07-3445, slip op. at 6.

In this matter, the Government has charged the Defendant with conspiracy and the illegal receipt of a firearm purchased out of state pursuant to 18 U.S.C. 371 and 2 and 18 U.S.C. 922 (a)(3). Neither evidence of drug selling or gang involvement establish a matter in issue other than Defendant's propensity to commit the crime charged. To prove its case, the Government must establish the Defendant willfully conspired to transport and receive (and did receive) in the State of Illinois, where he resided, a firearm purchased or otherwise obtained by him outside the State of Illinois. Evidence of unrelated drug and gang involvement is not relevant to motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Defendant's alleged involvement in drug and gang activity are not acts similar enough or close enough in time to be relevant to the elements to be proven. Certainly evidence of such other criminal participation is not sufficient to support a jury finding that the Defendant committed the acts charged.

But even if the Court determines that there is a sufficient basis to admit these collateral bad acts, their probative value is far outweighed by the prejudice it will generate. The note for subsection b of Rule 404 under the 1972 Proposed Rules observes in relevant part:

> . . . No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. *Citing Slough and Knightly, Other Vices, Other Crimes, 41 Iowa L. Rev. 325 (1956).*

The Government's witnesses will testify to their particular acquaintance and or friendship with the Defendant. The Government's case does not rise or fall on the fact that such acquaintance or friendship stemmed from the same gang association or involved a side line of drug selling. Additionally, the Government alleges in its indictment that Defendant distributed firearms purchased in Louisiana to individuals in the area of Chicago, Illinois. The Government does not need to show that these individuals may have been gang members. Such evidence might arguably be used in aggravation at a sentencing but is not necessary to prove an element in this offense. On the other hand, a jury might easily convict Mr. Robinson simply on the Government's evidence that he is or was a gang member who sold drugs. As the court observed in *United States v. Moccia* (1st Cir. 1982) (Breyer, J.) 681 F.2d 61, 63, while the evidence might be relevant under 404 (b), ". . . the risk that a jury will convict for crimes other than those charged - - or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment - - creates a prejudicial effect that outweighs ordinary relevance." *See also Michelson v. United States* (1948) 335 U.S. 469, 475-76; *United States v. Seals* (7th Cir. 2005) 419 F.3d 600, 610-611 (Posner, J., concurring).

      The Defendant requests the Court bar or otherwise limit evidence of drug selling and gang involvement pursuant to Federal Rule of Evidence 404 (b) and 403.

Respectfully submitted,

ss// Donna Hickstein-Foley
Attorney for the Defendant

9644 South Hamilton Avenue
Chicago, IL 60643-1631
773 881

My name is Carlos Orr. I am 36 years old. I live in ▮▮▮▮▮▮▮▮ and I have lived there for about the last 8 months. Prior to that, I lived in a half-way house in Chicago for about 2 months following my release from a federal prison in October 2006. I served a 51 month prison sentence as a result of my conviction for unlawful possession of a firearm and causing a false statement to be made to a firearm dealer. ~~I am testifying here today because~~ I agreed as part of my plea agreement ~~to cooperate with the government in connection with~~ the case. Prior to my conviction in July 2003, I was a manager at a nightclub in Chicago for about 4 years. I currently work several jobs, when work is available, including construction, general contracting and selling insurance.

In about 1991, I was convicted of second degree murder based on my conduct as a 19 year old. I received a 15 year sentence for that conviction, and I served about half of that time in prison.

I met Myron Robinson in Illinois in about 2001. I also know Robinson by the name "Boojie," or "Big C." I was introduced to him by Roynal Coleman, although I am not certain of how Coleman's first name is spelled. I know he is called "Nino" or "Ro." Coleman introduced me to Robinson because Robinson was a member of the Conservative Vice Lords in Maywood, and I lived in Maywood. Coleman had me drop off drugs to Robinson and pick up money from Robinson for him. I also was sort of a middleman when it came to drug dealing. In other words, I would arrange for my customers to buy drugs – usually either powder or crack cocaine and occasionally marijuana – from Coleman, and I would keep a cut of the proceeds from the sale of the drugs. I was also a Conservative Vice Lord, as was Coleman, although I did not hold rank in the gang. Coleman was a five-star universal, and Robinson was a three-star universal. I acted as a courier of drugs and money between Robinson and Coleman several times during about a several month period.

After a while, Robinson and I became friends. We also maintained our own drug



MYRON ROBINSON
312

relationship.

From my having been around Coleman, I have seen him give guns to members of his gang. He one time told me that he could never have enough guns. I had previously gotten guns for Coleman from people who I had met at the club where I worked or who I had met in prison. I had previously gotten guns for Coleman on many occasions. Coleman would usually give me some money for getting him the guns.

Some time after 2001, but before or during 2003, Coleman said that he needed some "heaters," which I understood to mean guns. This conversation took place at Robinson's house. Coleman and I had gone to Robinson's house because Coleman was trying to collect money from Robinson that Robinson owed to him. There was also a guy I know as "Losie" there. Losie was there because he was a member of Robinson's gang. During that conversation, Coleman told Robinson that he needed some heaters. Robinson told Coleman that he, Robinson, had a hook-up down south, which I understood to mean that he had a source for guns somewhere down south. Coleman and I left and Coleman told me to follow up with Robinson.

About a week or so later, Robinson and I talked in more detail about getting guns. We had this conversation at his house on 16th Avenue, near St. Charles Street, in Maywood, Illinois. Robinson told me that guns were cheap down south. Robinson called a girl named "Teresa," who he called his "play sister." I heard him tell her that his man was coming down to get some of those things, and to arrange for girls for us to party with. Robinson then put me on the phone with Teresa. Teresa told me that she was going to take care of me, and she told me that they can do that through the mail, which I understood to mean sending the guns through the mail.

Robinson and I planned to go to Shreveport, Louisiana, to get the guns. He, Losie and I

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF INVESTIGATION

Page 1 of 3

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Chicago Field Division | Chicago Field Division<br>FY-04<br>Report 022 |

| TITLE OF INVESTIGATION: | |
|---|---|
| [redacted] | |

| CASE NUMBER: | REPORT NUMBER: |
|---|---|
| 772015-03-0071 | 22 |

TYPE OF REPORT: (Check Applicable Boxes)

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY (Name) | SUBMITTED BY (Title and Office) | SUBMITTED BY (Date) |
|---|---|---|
| David J. Balkema | Special Agent, Chicago II (Firearms Trafficking) Field Office | 02/17/2004 |
| REVIEWED BY (Name) | REVIEWED BY (Title and Office) | REVIEWED BY (Date) |
| Donald J. Soranno | Group Supervisor, Chicago II (Firearms Trafficking) Field Office | 2/17/04 |
| APPROVED BY (Name) | APPROVED BY (Title and Office) | APPROVED BY (Date) |
| W. Larry Ford | Special Agent in Charge, Chicago Field Division | |

## DESCRIPTION OF ACTIVITY:

Interview of Theresa WOODARD.

DEFENDANT'S EXHIBIT B

## SYNOPSIS:

On February 11, 2004 Special Agent David Balkema and Task Force Agent Matthew Gainer interviewed Theresa WOODARD (F/B DOB: [redacted]). This interview concerned firearm purchases she had previously made in Shreveport, Louisiana on behalf of Carlos ORR and Myron ROBINSON. WOODARD additionally provided a signed, written statement detailing her dealings with ORR and ROBINSON. This interview occurred at Jason's Deli Restaurant, Shreveport, Louisiana.

## NARRATIVE:

1. On February 11, 2004, prior to meeting with WOODARD, she telephoned Task Force Agent Gainer who advised her of the agents wish to speak with her concerning her prior firearm purchases. WOODARD agreed to meet with the agents and suggested the Jason's Deli Restaurant as a location to meet.

2. Upon her arrival, the agents identified themselves to WOODARD and advised her she was not under arrest. WOODARD agreed to speak with the agents.

3. WOODARD stated she met Myron ROBINSON in 1998 in Shreveport, Louisiana. WOODARD stated she knew ROBINSON to be a member of the Vice Lord Street Gang originally from Chicago, Illinois. WOODARD stated she knew ROBINSON dealt drugs while residing in Chicago and had moved to

MYRON ROBINSON

ATF EF 3120.2 (5-98)

351

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF INVESTIGATION

Page 2 of 3

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Chicago Field Division | Chicago Field Division<br>FY-04<br>Report 022 |

| TITLE OF INVESTIGATION: |
|---|
| [redacted] |

| CASE NUMBER:<br>772015-03-0071 | REPORT NUMBER:<br>22 |
|---|---|

Shreveport to escape that lifestyle. WOODARD stated ROBINSON returned to Chicago a few years later.

4. WOODARD stated in March 2003, ROBINSON returned to Shreveport and introduced her to Carlos ORR. WOODARD stated ROBINSON told her ORR had traveled to Shreveport from Chicago for the purpose of purchasing firearms. WOODARD stated she knew ORR could not purchase firearms himself in Louisiana because he did not reside within the state. WOODARD stated she also knew ORR to be a drug dealer back in Chicago.

5. WOODARD stated that after meeting ORR, she agreed to purchase two (2) Hi Point pistols on his behalf from National City pawnshop. WOODARD stated ORR provided her the funds for purchase in addition to an extra $150.00 to $175.00 payment for her services. WOODARD stated after obtaining the firearms from the pawnshop, she brought them outside to a car where ORR was waiting. WOODARD stated she and ORR then drove to a Days Inn Hotel where they met ROBINSON. WOODARD stated when she arrived at the hotel, she observed ROBINSON with at least four (4) additional pistols. WOODARD stated ROBINSON and ORR removed the firearm serial number stickers from the manufacturer's boxes. WOODARD then saw them wrap the firearms in towels and place them in a larger box. WOODARD stated all three of them then went to a local Fed Ex location where she shipped the box of firearms to an address in Maywood, Illinois on their behalf.

6. WOODARD stated approximately one week later, ORR returned to Shreveport. WOODARD said about 3 days prior to his arrival; she received a wire transfer amount of $1000.00 from ORR to be used to purchase more firearms. WOODARD stated ORR had an acquaintance of hers, Mary HUGLON, purchase at least one firearm for him from National City pawnshop. WOODARD later saw that firearm and at least 13 other pistols at a Days Inn Hotel. WOODARD stated she later shipped these firearms via Fed Ex to Maywood, Illinois for ORR and ROBINSON.

7. WOODARD stated she would take ORR around Shreveport to help locate people to buy firearms for him. WOODARD stated when people in the neighborhood saw her with ORR it gave him more credibility.

8. WOODARD stated during this visit, she took an individual known to her as "ALLEN" to a Cash in a Flash pawnshop where he purchased five (5) pistols on behalf of ORR. WOODARD said that "ALLEN" did not have sufficient funds for the purchase of the 5 pistols so he came outside and ROBINSON gave him an extra $75.00. WOODARD stated these pistols were shipped via Fed Ex to Maywood, Illinois. WOODARD stated ROBINSON gave her $200.00 to pay the shipping costs.

9. WOODARD said she would provide different names than her own when dealing with Fed Ex employees.

10. WOODARD stated she learned from ORR and ROBINSON they were sending the firearms back to Maywood and/or Chicago to use in protecting themselves from the Gangster Disciples. WOODARD

| | |
|---|---|
| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 3 of 3 |
| ADDRESSED TO:<br>Special Agent in Charge<br>Chicago Field Division | MONITORED INVESTIGATION INFORMATION:<br>Chicago Field Division<br>FY-04<br>Report 022 |
| TITLE OF INVESTIGATION: ▓▓▓▓▓ | |
| CASE NUMBER:<br>72015-03-0071 | REPORT NUMBER:<br>22 |

stated they needed to protect themselves from the Gangster Disciples stemming from an incident that occurred at a Chicago area nightclub where many people died.

11. WOODARD stated she shipped firearms via Fed Ex twice for ORR and ROBINSON. WOODARD stated she later shipped one firearm to ROBINSON after he wired her the money to purchase it.

12. WOODARD stated she knew ORR had told another acquaintance of hers, MARCUS also known as "POON", that ORR would provide him with "Hydro" type weed to sell in Shreveport. WOODARD stated she did not know if "POON" ever received any Hydro from ORR.

13. WOODARD stated she knew within the Vice Lord Organization, ORR held higher status than ROBINSON, but that in Shreveport nobody would deal with ORR until ROBINSON gave his approval.

14. WOODARD stated ORR told her on one occasion he wanted to obtain at least fifty (50) firearms to ship back to Chicago.

15. WOODARD said on one visit ROBINSON and ORR brought someone named "DREW" with them.

16. Upon conclusion of the interview, WOODARD provided a signed written statement summarizing her statements to the agents.

ATTACHMENT:
Statement of Theresa WOODARD